**Paul David MUNSON, Petitioner,**

v.

**STATE of Alaska, Respondent.**

No. S–10444.

Supreme Court of Alaska.

Nov. 18, 2005.

**1044**

Cynthia L. Strout, Anchorage, for Appellant.

W.H. Hawley, Assistant Attorney General, Office of Special Prosecutions and Appeals, Anchorage, and Bruce M. Botelho, Attorney General, Juneau, for Appellee.

Before: FABE, Chief Justice, MATTHEWS, EASTAUGH, BRYNER, and CARPENETI, Justices.

*OPINION*

CARPENETI, Justice.

## I. INTRODUCTION

During a custodial interrogation, murder suspect Paul Munson unambiguously declared that he wished to terminate the interrogation. The investigator continued questioning Munson, who subsequently confessed to his participation in the crime. The trial court suppressed the confession. The court of appeals reversed, finding that Munson had only ambiguously invoked his right to remain silent, that an ambiguous request is insufficient to invoke the right, and that a police interrogator has no duty to clarify an ambiguous invocation of the right. Because we find that Munson unambiguously invoked his right to remain silent, we reverse the decision of the court of appeals.

## II. FACTS AND PROCEEDINGS

### A. Facts

On September 14, 1999 Paul Munson was charged with the murder of Morgan ("Wolfie") Gorsche. The state alleged that Munson and three friends killed Gorsche in retaliation for allegedly molesting a three-year old girl. On September 15 Munson was arrested in Portland, Oregon by Anchorage police detectives Joseph Hoffbeck and David Parker, who interviewed Munson at a Portland police station before his extradition to Alaska. They informed Munson of his *Miranda*[1] rights and proceeded to ask him questions about the murder. A few minutes into the interview, as Detective Hoffbeck began to ask questions directly related to the homicide, Munson expressed fear that a co-defendant, Samuel Camanga, might learn of his discussion with the police, and he indicated that he did not want to discuss the crime:

[Munson]: What's gonna happen? Is Sam gonna know I'm saying this?

[Investigator]: Maybe Sam's already talked to me.

[Munson]: No, but . . .

[Investigator]: Eventually Sam is going to know, yes . . . the answer to that is yes. Everybody . . . everybody involved is going to know eventually . . . yes they will.

[Munson]: *Well, I'm done talkin' then.*

---

1. *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

(Emphasis added.) Rather than ceasing the questioning at this point, Detective Hoffbeck continued:

[Investigator]: Before you make a final decision on that there ... play that tape there for him ...

[Munson]: You know what'll happen to me?

[Investigator]: Listen to this here ... [2]

Hoffbeck then played a recording, which had been surreptitiously obtained pursuant to a *Glass* warrant,[3] of Munson discussing the killing with another co-defendant, Shane Clapper. After playing the recording and attempting to persuade Munson that his fears were unfounded, the investigator continued questioning Munson, who eventually confessed to his participation in the murder and implicated Sam Camanga as the person who actually shot Gorsche.

## B. Proceedings

At an evidentiary hearing before Superior Court Judge Michael L. Wolverton, Munson argued that his confession should be suppressed because the state failed to honor his request to remain silent. Judge Wolverton agreed with Munson, concluding that he had attempted to invoke his right to remain silent when he said "Well, I'm done talkin' then," and that the investigator violated this right by continuing the interrogation. The court suppressed Munson's statements following his invocation of the right to remain silent.

The state petitioned for review, arguing that suppression was inappropriate because Munson had only equivocally invoked his right to remain silent, which, it claimed, was insufficient to trigger the state's obligation to terminate the interrogation or to clarify Munson's intent. The court of appeals agreed.[4] The appeals court first found that Munson had ambiguously invoked his right to remain silent.[5] Although the trial court had made no such finding, the court of appeals concluded that such a determination was implicit in the trial court's description of what the police should have done after Munson said, "Well, I'm done talkin' then." [6] The court then noted that while Alaska law requires the police to clarify ambiguous requests for counsel,[7] the U.S. Supreme Court's more recent pronouncement in *Davis v. United States*[8] imposes no such duty on police interrogators.[9] Citing a number of jurisdictions that have construed *Davis* to also require an unambiguous invocation of the right to remain silent,[10] and reasoning that "the right to counsel is more rigidly observed than the right to silence," [11] the court concluded that the police have no duty to clarify an ambiguous invocation of the right to remain silent, and it reversed the suppression of Munson's confession.[12] We granted review.

## III. STANDARD OF REVIEW

▮▮▮ Whether Munson invoked the right against self-incrimination protected by both

2. A transcript of the relevant portion of the interview is attached to this opinion as an appendix.

3. *See State v. Glass*, 583 P.2d 872, 881 (Alaska 1978), *on reh'g*, 596 P.2d 10 (Alaska 1979) (holding that under Alaska Constitution police must obtain judicial authorization before surreptitiously recording private conversation).

4. *State v. Munson*, Mem. Op. & J., No. 4494 at 14–15, 2001 WL 1477918 (Alaska App., Nov. 21, 2001).

5. *Id.* at 14, 2001 WL at *6.

6. *Id.* Judge Wolverton suppressed Munson's statement because he concluded that an invocation of either the right to remain silent or the right to counsel triggers a duty by the police to clarify a suspect's intent to exercise his right against self-incrimination.

7. *Hampel v. State*, 706 P.2d 1173, 1180 (Alaska App.1985).

8. 512 U.S. 452, 461–62, 114 S.Ct. 2350, 129 L.Ed.2d 362 (1994).

9. *State v. Munson*, Mem. Op. & J., No. 4494 at 15–17, 2001 WL 1477918, at **6–7 (discussing development of state and federal law regarding ambiguous invocations of right to counsel).

10. *Id.* at 16, 2001 WL at *7, n. 45.

11. *Id.* at 17, 2001 WL at *7 (citing *Hampel v. State*, 706 P.2d 1173, 1179 n. 4 (Alaska App. 1985)).

12. *Id.* at 19, 2001 WL at *8.

the United States [13] and Alaska Constitutions [14] presents a mixed question of law and fact that we review using our independent judgment.[15] We adopt factual findings made by the trial court that are not clearly erroneous.[16] In the absence of express findings, we must resolve disputed factual issues in favor of the party prevailing in the trial court.[17] We review questions of law *de novo*,[18] and "adopt the rule of law that is most persuasive in light of precedent, reason, and policy." [19]

## IV. DISCUSSION

### A. Munson's Request To Terminate the Custodial Interrogation Was Unambiguous.

■ Was Munson's statement, "Well, I'm done talkin' then," adequate to invoke the right to silence protected by the Fifth Amendment to the Federal Constitution and article I, section 9 of the Alaska Constitution? On its face, Munson's statement was entirely unambiguous: He clearly indicated that he was finished talking with the police. The state argues, as it did below, that the context of Munson's comment showed that he was afraid of retaliation by Sam Camanga—not of incriminating himself. The state reasons that Munson's request was therefore equivocal and thus insufficient to trigger any duty by the police to honor Munson's right to silence. The court of appeals agreed.[20]

We agree that the context of Munson's statement suggests that he wanted to termi-nate the interrogation because he was afraid of retaliation by Sam Camanga. But there was nothing ambiguous about the statement itself; and an otherwise unambiguous request to terminate a custodial interview does not become somehow equivocal because it might be motivated by a fear of retaliation.[21] Indeed, Detective Hoffbeck testified that he understood Munson's request as an attempt to cut off questioning entirely, but that he did not consider this statement to be an invocation of the right to silence because Munson did not express his desire in a manner which required him to cut off questioning.[22] Thus, we conclude that a reasonable officer in these circumstances would have understood Munson's statement that he was "done talkin'," without condition or qualification, to be an unequivocal invocation of his right to silence. Though the test is an objective one, we also note that the investigator testified at the suppression hearing that he understood that Munson "wanted to stop at that point," and that his subsequent questioning (despite Munson's request) was based on an incorrect understanding of a suspect's right to silence—the investigator believed that he had no duty to stop asking questions until a suspect asks to speak with a lawyer or actually does not answer questions. Moreover, the superior court made no express finding that Munson's request was equivocal. To the contrary, the court's comments at the suppression hearing strongly imply that Munson's request was unambiguous.[23] Be-

13. U.S. Const. amend. V.

14. Alaska Const art. I, § 9.

15. *See, e.g., State v. Smith,* 38 P.3d 1149, 1153 (Alaska 2002) (whether suspect in custody for *Miranda* purposes presents mixed question of law and fact qualifying for independent review) (internal quotations and citations omitted).

16. *Id.*

17. *Id.*

18. *Id.*

19. *Guin v. Ha,* 591 P.2d 1281, 1284 n. 6 (Alaska 1979).

20. *State v. Munson,* Mem. Op. & J., No. 4494 at 19, 2001 WL 1477918, at *8.

21. For more discussion on the effect of a suspect's subjective motivation on his custodial invocation of the right to silence, *see infra* Part IV.B.

22. On direct examination at the suppression hearing, the investigator acknowledged that he understood that Munson "wanted to stop at that point," but indicated his belief that he had no duty to stop asking questions until a suspect asks to speak to a lawyer or refuses to answer questions.

23. Our review of the transcript from the evidentiary hearing convinces us that Judge Wolverton's comments are best understood to indicate that an invocation of the right to silence accords similar protections as an invocation of the right to counsel, not that Munson's request was ambiguous.

cause we conclude that Munson's statement "Well, I'm done talkin' then" was an unambiguous request to terminate the interview, the question is not whether Munson's request was equivocal, but rather whether, in order for a suspect to validly invoke the right to silence, it must be clear that his reason for doing so is specifically motivated by a fear of self-incrimination.

Because we find that Munson's request was unequivocal, we decline to address whether the police have an obligation to clarify an ambiguous invocation of the right to silence, and whether the dual prongs of *Miranda*[24] are entitled to differing levels of protection. Instead, we focus on the core issue, which is whether Munson had a right to remain silent even if his unambiguous request to do so might have been motivated by immediate fear of a co-defendant.

**B. The Right to Silence Asserted by Munson Was Protected by Both the Federal and State Constitutions, Regardless of Munson's Subjective Fear of Retaliation.**

We turn to the question whether a statement by a suspect that he was "done talkin' " is a valid invocation of the right to silence if it was not clearly motivated by fear of self-incrimination. If our answer is "yes," then the police investigators were bound by *Miranda* and its progeny to respect that right; but if the request was not constitutionally-protected, then the investigators had no duty to stop the interrogation or to clarify Munson's intentions.

We begin our analysis with the words of the Fifth Amendment to the United States Constitution and article I, section nine of the Alaska Constitution, both of which guarantee that no person "shall be compelled in any criminal [case or proceeding] to be a witness against himself." These simple words form the basis of a criminal defendant's rights to counsel and to remain silent.[25] While the core protection is a prohibition on compelling a defendant to testify against himself at trial,[26] *Miranda* and our own cases under the Alaska Constitution show that this protection is enforceable in any setting where a suspect is subject to custodial police interrogation.[27] Indeed, because such an interrogation is inherently coercive, *Miranda* laid down "concrete constitutional guidelines," which include the requirement to give a defendant the four specific warnings that comprise his so-called *Miranda* rights.[28] The failure to provide proper warnings or to obtain a waiver of those rights is generally sufficient to exclude any statements obtained.[29] This rule-based approach establishes a bright-line standard for admissibility of confessions;[30] and the litmus test is not only whether the suspect voluntarily made a statement,[31] but whether his waiver of the right to silence or to counsel was knowing and intelligent.[32] Although *Miranda's* requirements sweep beyond the literal protections of the Fifth Amendment,[33] the U.S.

---

**24.** *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966) (Fifth Amendment protection against self-incrimination grants to suspect in custodial interrogation right to counsel and right to remain silent).

**25.** *Id.* at 439, 86 S.Ct. 1602; *Beavers v. State,* 998 P.2d 1040, 1045–46 n. 25 (Alaska 2000); *see also Dickerson v. United States,* 530 U.S. 428, 435, 120 S.Ct. 2326, 147 L.Ed.2d 405 (2000).

**26.** *See, e.g., United States v. Patane,* 542 U.S. 630, 638, 124 S.Ct. 2620, 159 L.Ed.2d 667 (2004).

**27.** *Miranda,* 384 U.S. at 477, 86 S.Ct. 1602; *Beavers,* 998 P.2d at 1045 & n. 25.

**28.** *Dickerson,* 530 U.S. at 435, 120 S.Ct. 2326 (discussing *Miranda,* 384 U.S. at 442, 479, 86 S.Ct. 1602).

**29.** *Missouri v. Seibert,* 542 U.S. 600, 608, 124 S.Ct. 2601, 159 L.Ed.2d 643 (2004).

**30.** *See Smith v. Illinois,* 469 U.S. 91, 99 n. 8, 105 S.Ct. 490, 83 L.Ed.2d 488 (1984).

**31.** *Dickerson,* 530 U.S. at 433–34, 120 S.Ct. 2326.

**32.** *Smith,* 469 U.S. at 95, 105 S.Ct. 490; *see also Edwards v. Arizona,* 451 U.S. 477, 486 n. 9, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981).

**33.** *United States v. Patane,* 542 U.S. 630, 639, 124 S.Ct. 2620, 159 L.Ed.2d 667 (2004).

Supreme Court has described *Miranda* as a "constitutional rule." [34]

▮▮▮▮▮▮ *Miranda* makes clear that a defendant can invoke his right to silence and end the interrogation "in any manner, at any time prior to or during questioning." [35] If a suspect in a custodial interrogation

indicates in any manner and at any stage of the process that he wishes to consult with an attorney before speaking there can be no questioning. Likewise, *if the individual is alone and indicates in any manner that he does not wish to be interrogated, the police may not question him.* The mere fact that he may have answered some questions or volunteered some statements on his own does not deprive him of the right to refrain from answering any further inquiries . . . [36]

▮▮▮▮ Subsequent decisions by the U.S. Supreme Court have clarified the state's duties when a suspect invokes his Fifth Amendment rights. A defendant has the right not only to cut off questioning entirely, but also to "control the time at which questioning occurs, the subjects discussed, and the duration of the interrogation." [37] Additionally, the police must "scrupulously hon-

or[ ]" a suspect's invocation of the right to silence. [38]

▮▮▮▮▮▮ "No ritualistic formula or talismanic phrase is essential in order to invoke the privilege against self-incrimination;" [39] all that is required to invoke *Miranda's* protections is a statement with sufficient clarity that a reasonable police officer in the circumstances would understand it to be an invocation of the suspect's rights. [40] To validly invoke the privilege, the suspect must face some hazard of incrimination, but this threshold requirement is met whenever "the answers elicited could support a conviction or might furnish a link in the chain of evidence leading to a conviction." [41]

▮▮▮▮ Thus, a proper invocation of the privilege against self-incrimination under *Miranda* requires only three things: a custodial interrogation, [42] a statement that would reasonably be understood as an invocation of the privilege, [43] and the clear possibility from the context of the interrogation that a responsive answer "might be dangerous because injurious disclosure could result." [44] Once a suspect makes "an attempt to cut off questioning entirely," [45] his request must be "scrupulously honored." [46] In the face of an unequivocal invocation of those rights, police

34. *Dickerson*, 530 U.S. at 444, 120 S.Ct. 2326.

35. *Miranda v. Arizona*, 384 U.S. 436, 473–74, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

36. *Id.* at 444–45, 86 S.Ct. 1602 (emphasis added).

37. *Michigan v. Mosley*, 423 U.S. 96, 103–04, 96 S.Ct. 321, 46 L.Ed.2d 313 (1975).

38. *Id.* at 104, 96 S.Ct. 321. Cautioning against the "absurd and unintended results" that could flow from unreasonably literal interpretation of *Miranda*, the *Mosley* Court held that while *Miranda* did not require the perpetual cessation of interrogation after a suspect has invoked his right to silence, neither did it "permit a resumption of interrogation after a momentary respite." *Id.* The Court did not define precisely what it meant by "scrupulously honor[ing]" a suspect's invocation of the right to silence, but it found that Mosley's rights were fully respected because, after he invoked his right to silence, the officer ceased questioning him entirely and, after a delay of more than two hours, Mosley was re-Mirandized by another officer and interviewed about a separate crime. *Id.* at 104–06, 96 S.Ct. 321. The court found these actions to be suffi-

cient because it saw no evidence that the police had failed to respect a request to cut off questioning or had made repeated efforts to "wear down his resistance and make [the defendant] change his mind." *Id.* at 105–06, 96 S.Ct. 321.

39. *Emspak v. United States*, 349 U.S. 190, 194, 75 S.Ct. 687, 99 L.Ed. 997 (1955).

40. *Davis v. United States*, 512 U.S. 452, 459, 114 S.Ct. 2350, 129 L.Ed.2d 362 (1994).

41. *State v. Gonzalez*, 853 P.2d 526, 530 (Alaska 1993) (quotation omitted).

42. *Miranda*, 384 U.S. at 477, 86 S.Ct. 1602.

43. *Davis*, 512 U.S. at 459, 114 S.Ct. 2350.

44. *Hoffman v. United States*, 341 U.S. 479, 486–87, 71 S.Ct. 814, 95 L.Ed. 1118 (1951).

45. *Vail v. State*, 599 P.2d 1371, 1378 (Alaska 1979).

46. *Michigan v. Mosley*, 423 U.S. 96, 104, 96 S.Ct. 321, 46 L.Ed.2d 313 (1975).

interrogators have very limited discretion to inquire into the defendant's subjective intent because they cannot, even to clarify a suspect's intent, "wear down his resistance and make him change his mind." [47] These principles convince us that a suspect in a custodial interrogation can validly invoke his rights even if he may be motivated by a reason other than preventing self-incrimination.[48] That is, so long as the suspect's apparent motives do not cast genuine doubt on his desire to stop questioning entirely, then the issue of why he wants to do so is constitutionally irrelevant: the officer must scrupulously honor the suspect's request.

The bright line rules articulated by *Miranda* and its progeny exist precisely because it is inappropriate to require the police to make difficult judgment calls about a defendant's underlying motivations for invoking his rights.[49] It will not always be apparent whether a suspect is attempting to cut off questioning to prevent self-incrimination; or because he is emotional, tired, angry, confused, frightened, or overwhelmed; or because of a combination of reasons. And the cost of clarification is simply too great: Not only would inquiry into a suspect's motivations prove a quagmire for police interrogators, but it would radically diminish *Miranda's* protections. Almost every invocation of the right to si-

lence or to counsel could contain some ambiguity on the suspect's motives. If the police were permitted to aggressively inquire into a suspect's subjective intent for invoking the right, the suspect could well believe that his rights are illusory.[50] While the context of Munson's statement suggests that he was more likely afraid of Sam Camanga than of incriminating himself, it was not for the interrogator to speculate about Munson's motives because the request itself was entirely unambiguous. The circumstances surrounding Munson's interrogation demonstrate that this approach provides the clearest possible guidance for applying the requirements of *Miranda* and *Mosley* during a custodial interrogation.

The transcript of the interrogation shows just how relentless an interrogator can be when attempting to clarify a suspect's invocation of his rights. From almost the moment Munson's interrogation began, he was told that invocation of his rights was irrelevant since the police already had evidence linking him to the crime, including the tape recording in which Munson acknowledged his presence when Gorsche was killed. After reading Munson his *Miranda* rights, but before seeking a waiver of those rights, Detective Hoffbeck laid out his case against Munson.

[Interrogator]: Ok. Now having these [*Miranda*] rights in mind now I wanta ask

---

47. *Id.* at 106, 96 S.Ct. 321.

48. To the extent that this interpretation may be more protective than federal constitutional law, we base our ruling on article I, section 9 of the Alaska Constitution. *See Beavers v. State,* 998 P.2d 1040, 1046 n. 30 (Alaska 2000). While we have observed that the language of § 9 is "virtually identical" to the wording of the Fifth Amendment of the United States Constitution, *Biele v. State,* 371 P.2d 811, 813 n. 6 (Alaska 1962), we have interpreted § 9 more broadly than the U.S. Supreme Court has construed the Fifth Amendment of the Federal Constitution. *Scott v. State,* 519 P.2d 774, 785 (Alaska 1974). In so doing, we noted our "responsibility to depart whenever necessary from constitutional interpretations enunciated by the United States Supreme Court and to develop rights and privileges under the Alaska Constitution in accordance with our own unique legal background." *Id.* at 783. We do so because "[w]e are not bound to follow blindly a federal constitutional construction of a fundamental principle if we are convinced that the result is based on unsound reason or logic." *Id.*

More recently, in *State v. Gonzalez,* 825 P.2d 920 (Alaska App.1992), the court of appeals expressed hesitation to blindly adhere to changes in federal constitutional law where unexpected decisions of the Supreme Court " 'have forced a serious reevaluation of ... fundamentals.' " *Id.* at 931 (internal citations omitted). Ultimately, the court concluded that "[t]he United States Supreme Court's decisions interpreting the fifth amendment do not decide the meaning of the Alaska privilege, and similarity in language does not make the United States Supreme Court the primary interpreter of article I, § 9." *Id.* (The court of appeals accordingly declined to adopt the Court's decision to allow use and derivative use immunity to act as a substitute for the privilege against self-incrimination or transactional immunity. *Id.* at 936.)

49. *Davis,* 512 U.S. at 461, 114 S.Ct. 2350.

50. *See, e.g., Mallott v. State,* 608 P.2d 737, 741–43 (Alaska 1980) (ignoring or rebuffing suspect's invocation of his rights will convince him that such rights are illusory).

you ... I wanta tell you basically a couple of things that we ... that we know about.

[Munson]: Uhhuh.

[Interrogator]: And then at the end of that there if you wanta talk to us you can talk to us, OK?

[Interrogator describes the evidence the police have collected, including the incriminating tape of Munson discussing the crime with a co-defendant.]

[Interrogator]: Ok? So we have all that information about you ... the choice is up to you ... you wanta talk to us about it?

[Munson]: I have a question about that. What happens to me if I talk to you guys?

[Interrogator]: Whether you talk to us or not, the same thing is gonna happen to ya.

[Munson]: So if I don't say anything ... the same thing'll happen to me?

. . . .

So I'm gonna go to jail?

[Interrogator]: Of course, yes, you're going to go to jail.

[Munson]: And it doesn't matter if I talk or anything? Right?

At this point in the conversation, Detective Hoffbeck informed Munson that his cooperation could have an impact on how a judge approached sentencing, and he began to ask questions about the crime. Only when Munson began to answer his questions did the investigator ask if he was willing to speak with him. But when Munson attempted to revoke his waiver, and to assert his right to silence, Detective Hoffbeck again tried to convince him of the futility of remaining silent.

[Munson]: What's gonna happen? Is Sam gonna know I'm saying this?

[Investigator]: Maybe Sam's already talked to me.

[Munson]: No, but ...

[Investigator]: Eventually Sam is going to know, yes ... the answer to that is yes. Everybody ... everybody involved is going to know eventually ... yes they will.

[Munson]: Well, I'm done talkin' then.

[Investigator]: Before you make a final decision on that there ... play that tape there for him. . . .

[Tape playing in which Munson acknowledges that he was present when Gorsche was killed.]

[Investigator]: You've already said it ...

[Munson]: I know but ...

[Investigator]: So what's the point? You've already said it so ...

Although the state conceded below that "a defendant can invoke his right to silence for any reason—even a whim—and the police must respect his decision," the state nonetheless maintains that Munson never invoked his constitutional rights because his request was motivated by a fear of Sam Camanga and, thus, equivocal.[51] The state argued below that the investigator clarified Munson's equivocal request by playing the recording of his incriminating discussion with a co-defendant, and that Munson's later confession demonstrated that his concerns were allayed and his statements were voluntary. But the overall impact of the investigator's comments, as well as his specific response to Munson's request to terminate the interrogation, demonstrate the inherently coercive nature of a custodial interrogation and reinforce the need for clear standards to govern an interrogator's conduct in the face of a suspect's invocation of his *Miranda* rights.

**51.** We note that Detective Hoffbeck himself had a different understanding of *Miranda's* requirements. He testified that, in order to invoke his *Miranda* rights, a suspect must either ask for an attorney or stop talking; but a suspect's statement that "I'm done talking," "I've got nothing more to say," or "I'm—finished, I quit" imposes no duty on an investigator to stop asking questions. While a more limited statement than "I'm done talkin' then" might reasonably be construed as equivocal, *i.e.,* to express an unwillingness to speak with a particular interrogator or to respond to a particular inquiry, 2 W.R. LaFave, et al., Criminal Procedure § 6.9(g) at 606 (2d ed. 1999), there is no basis to interpret Munson's broad statement as anything but an unconditional request to cut off all questioning.

While it is the centerpiece of the state's position that Munson's request was equivocal, it is clear that Detective Hoffbeck understood that Munson was trying to cut off questioning entirely. Indeed, in his suppression hearing testimony, the investigator never claimed confusion or uncertainty concerning Munson's desire to stop the interrogation.[52] Yet instead of scrupulously honoring what literally was a present-tense, unequivocal, unconditional attempt to cut off all further questioning, the investigator brushed off Munson's decision and insisted that Munson needed to make yet another decision—a *"final* decision": "Before you make a final decision on that there ... play that tape there for him...." The investigator then set in motion a prepared playback of a surreptitiously recorded conversation between Munson and a police informant; the playback was apparently intended to persuade Munson that his decision was wrong: that

---

52. On direct examination at the suppression hearing, the investigator acknowledged that Munson wanted to stop the interrogation, but indicated that he didn't view this as an invocation of the *Miranda* rights; the only reason he suggested for this view was that Munson's decision to stop appeared motivated by fear:

Q. Okay. And there also came a point, and I pointed it out to you where he indicated that you were talking to him about Sam Kamanga (ph) and the others are going to learn basically what he's saying. Do you remember that?

A. Yes.

Q. Okay. And do you remember what he said in reply to that once he kind of learned that Mr. Kamanga (ph) was going to learn what it was that he was telling you?

A. He said that he didn't want to talk anymore.

Q. Okay. And what did you take that as? I mean, did you accept—did you think that he was invoking his *Miranda* rights, for instance?

A. No.

Q. What did that mean to you when he said that?

A. *He wanted to stop at that point,* I think is what he—I got the impression that he didn't really want Sam to hear what he had to say. And so at that point then he says, no, I got nothing—I don't—I want a—I forget exactly the—the words he said. But I said, before you make up your final mind, listen to what—what's on this tape here.

(Emphasis added.)

Returning to this issue in his cross-examination, the investigator cemented the point that he hadn't seen anything circumstantially ambiguous in Munson's desire to stop questioning, but merely felt that Munson did not express his desire in a way that required the investigator to cease the interrogation:

Q. ... So when Paul said, I'm done talking, then, you didn't say, do you mean you want to stop talking, did you?

A. Nope.

Q. Probably because that would have sounded kind of stupid since he just said I'm done talking, right?

A. Is that a question?

Q. Yeah, that was a question.

A. Well, what was your question again?

Q. My question was if someone says to you, I'm done talking, to ask them are you done talking ...

A. They—I've heard that said to me many times in an interview ...

Q. No ...

A. ... I've got nothing more to say, I'm—I'm finished, I quit.

Q. Uh-huh (affirmative). And do you always just keep right on interrogating?

A. Until they ask to—to talk—for a lawyer or something, I do, yeah.

Q. I see, okay. So to you there's no distinction between saying, I'm done talking, that—it doesn't matter until they ask for a lawyer, is that what you're ...

A. No, no, because—go back to the rights there. It says you can stop talking at any time.

This testimony does not suggest any misunderstanding of Munson's request. In the investigator's view, Munson was free to exercise his *Miranda* right of silence by refusing to answer at any time, but he could not prevent continued interrogation unless he expressly pinned his decision to a request for counsel. (Or perhaps, viewing the testimony most charitably to the investigator and in the light least favorable to affirming the superior court's decision, it might have been enough for Munson to have pinned his decision to his specific intent to invoke his right against self-incrimination, excluding all lesser reasons; but even under this charitable view, Munson could not have forced interrogation to stop merely for fear of reprisals.) Despite recognizing that Munson had made a clear request to end the interrogation, then, the investigator nonetheless felt that Munson had failed to invoke his *Miranda* rights because he had failed to come up with the right reason for stopping: it was up to Munson to cease answering under these circumstances, the investigator believed, not up to him to cease questioning. As the superior court implicitly recognized, the investigator's testimony—however well-intentioned it might have been—simply betrayed a fundamentally incorrect understanding of *Mosley's* requirement that police conducting a custodial interrogation must scrupulously honor any clear attempt by the defendant to cut off questioning entirely.

he might as well talk because the police had already secretly recorded him, he was already exposed, and—in the investigator's opinion—he didn't need to be afraid in any event. By the standard established in *Rhode Island v. Innis,* the investigator's tactic unquestionably amounted to further interrogation.[53]

The court of appeals seems to have assumed that Munson's desire to cut off questioning became equivocal because he evidently acted for a specific reason other than the one specified by the constitution: avoiding self-incrimination. Yet this tacit premise does not hold up to scrutiny. Under *Miranda,* a defendant like Munson does not need to radiate constitutionally pure motives; he just needs to make a clear attempt to stop questioning entirely. If his apparent motives do not cast genuine doubt on *what* he wants (that is, to stop questioning entirely), then the issue of *why* he wants it is constitutionally irrelevant: the officer must scrupulously honor the defendant's clear attempt to cut off questioning entirely.[54]

To be sure, a defendant may not assert the right to silence when the privilege against self-incrimination does not attach to the questioning. But for purposes of determining whether the privilege attaches, our case law requires us to pose a situation-specific, not a motive-specific, question. We do not inquire what reasons prompt the defendant's refusal to speak; we simply ask whether the state's questions present a real risk of incrimination:

> To establish a Fifth Amendment claim, parties invoking the privilege have the burden of demonstrating a valid reason to believe that their compelled statements might incriminate them. This burden is not great: "To sustain the privilege, it need only be evident from the implications of the question, in the setting in which it is asked, that a responsive answer to the question or an explanation of why it cannot be answered might be dangerous because injurious disclosure could result." [55]

*Miranda* itself recognizes that custodial interrogation inherently poses a sufficient danger of incrimination to sustain the privilege. Here, Munson was subjected to custodial interrogation and was read his *Miranda* rights. Because the interrogation certainly placed him at risk of self-incrimination, the privilege unquestionably attached. He had a right to invoke it by expressing a clear desire to cut off the interrogation entirely, regardless of his subjective intent in doing so.

Of course Munson's apparent motives would have been relevant if the totality of circumstances surrounding the interrogation, including his apparent motives, cast genuine doubt on his desire to stop the questioning completely. LaFave recognizes that sometimes, "[d]epending on the surrounding circumstances, even a statement which itself appears to amount to an assertion of the right to remain silent (e.g., 'I ain't saying nothing') may be held to [be ambiguous or equivocal]." [56] But as LaFave indicates, the ambiguity in these situations must arise from contextual circumstances suggesting that the defendant's reluctance "is much more limited" than wanting to stop the interrogation entirely.[57] Hence, if Munson's apparent fear,

---

**53.** *Rhode Island v. Innis,* 446 U.S. 291, 301, 100 S.Ct. 1682, 64 L.Ed.2d 297 (1980) (defining "interrogation" under *Miranda* to include "any words or actions on the part of police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response").

**54.** *Michigan v. Mosley,* 423 U.S. 96, 96 S.Ct. 321, 46 L.Ed.2d 313 (1975).

**55.** *James v. State,* 75 P.3d 1065, 1068 (Alaska App.2003) (footnotes omitted) (quoting *Hoffman v. United States,* 341 U.S. 479, 486–87, 71 S.Ct. 814, 95 L.Ed. 1118 (1951)).

**56.** 2 W.R. LaFave, et al., Criminal Procedure § 6.9(g) at 606 (2d ed.1999).

**57.** *Id.* at 607. The cases the state cites as involving invocations of *Miranda* that were deemed ambiguous despite being clear in the literal sense support LaFave's assertion, generally describing circumstances that made the literal requests to stop questioning appear to be "much more limited" in their intended meaning. *Id.* at 607–09 and nn. 138–44. LaFave notes:

> As for assertion of the right to remain silent, any declaration of a desire to terminate the contact or inquiry (e.g., "Don't bother me") should suffice. The same is true of silence in the face of repeated questioning, or an effort to end the contact with the interrogator. On the other hand, a statement which is much more limited in the sense that it expresses an unwillingness to respond to a particular interrogator

combined with other relevant circumstances, created a reasonable appearance that his categorical announcement that he was "done talkin' " was merely a tentative decision—or that it was fleeting, conditional, or even concealed a true desire to be questioned—then certainly his attempt to cut off questioning might fairly be characterized as ambiguous or equivocal.

But here, as already noted, the circumstances hardly lend themselves to this characterization: Munson's announcement itself unequivocally and unconditionally declared his decision to cut off questioning; and the surrounding circumstances, including Munson's apparent motive for stopping, left little room for confusion. As noted, the investigator never claimed that he saw anything equivocal, ambiguous, or conditional about Munson's desire to stop questioning entirely. He understood that Munson wished to stop the questioning[58] but erroneously thought that he was free to press on *despite* Munson's wishes unless and until Munson formally invoked his *Miranda* rights by either asking for counsel or by refusing to continue talking.[59] Nothing in the circumstances surrounding Munson's declaration, in Munson's apparent motives for making the declaration, or in the declaration itself gave the investigator any reasonable basis to think that Munson was not making "a final decision" or that he was trying to do anything other than what he expressly declared that he wanted to do— to cut off the questioning entirely. At this point, *Miranda* and *Mosley* required the investigator to scrupulously honor the request,

and precluded him from simply pressing on with his interrogation.

The investigator's determination to ignore Munson's request seems particularly unreasonable when considered in light of the approach used in the interrogation leading up to Munson's request. The investigator began the interrogation by reading Munson his *Miranda* rights and asking if he understood them. But instead of asking immediately whether Munson wanted to invoke these rights, the investigator purposely delayed this question, saying that Munson would receive the opportunity to invoke his rights later, after the investigator provided some additional information. He then began to give Munson information that by any objective measure was bound to encourage cooperation, engage him in discussion, and produce incriminating statements. The additional information also created a considerable gap between the reading of Munson's rights and his opportunity to invoke them. In conducting the balance of the interview, the investigator believed *Miranda* required him to stop the interrogation only if Munson actually refused to talk or expressly invoked his right to counsel; on appeal, however, the state takes a different position. Despite the gap between the reading of Munson's *Miranda* rights and his first opportunity to assert them, the state now contends that Munson could invoke his rights only by making a demand to stop talking that clearly drew a connection between his desire to stop and his by-then-distantly read rights. But this position would allow the competitive enterprise of

---

... or an unwillingness or inability to respond to a particular inquiry ... is not a general claim of the privilege.
*Id.* at 606.

**58.** While the *Miranda* test is an objective one— that is, the court must objectively evaluate whether Munson's demand to stop talking was equivocal under the totality of the circumstances in which it was actually made—we believe that an understanding of the investigator's subjective state of mind is relevant to our inquiry, for it tends to show how a presumably reasonable officer with a first—hand view actually did understand the defendant's request to stop talking. Because the officer's subjective impression— here, that Munson wished to end the interrogation—coincides with our own, it tends to confirm

that our impression of the record is an accurate assessment of what a reasonable officer would think.

**59.** Munson's statement of "Well, I'm done talkin' then" could be viewed as a conditional assertion of silence—that is, that Munson would not speak to the interrogator unless he was first granted protection from his co-defendant. Without deciding whether and to what extent an interrogator may respond to a conditional invocation, we note that the investigator's response to Munson's statement was in no way an inquiry into whether the interrogation could continue if the condition were satisfied. Rather, his response was simply directed at persuading Munson to withdraw his otherwise unequivocal invocation.

custodial interrogation to be carried a step too far.

Viewed against this backdrop, the investigator's perfunctory dismissal of the clear and unequivocal attempt to cut of all further questioning, and his insistence on a new round of interrogation before allowing a "final decision," could easily have convinced Munson that the investigator was determined to keep pressing his interrogation and was bound to deny *Miranda's* "critical safeguard": Munson's ability to "control the time at which questioning occurs, the subjects discussed, and the duration of the interrogation." [60] Upon hearing the demand for a "final decision," any reasonable person in Munson's position would have recognized that his *Miranda* rights were merely illusory because the investigator had seized full control.

*Miranda* exists to protect the rights of the criminally-accused in precisely these situations. An interrogator cannot try to convince a suspect that his silence is futile; the police cannot fail to honor a suspect's request by "refusing to discontinue the interrogation . . . or by persisting in repeated efforts to wear down his resistance and make him change his mind." [61] Nor, as the prosecutor implied below, can Munson's confession be deemed voluntary by the fact that he continued to speak with the interrogators after the tape was played. As the U.S. Supreme Court has emphasized:

> Using an accused's subsequent responses to cast doubt on the adequacy of the initial request *itself* is . . . intolerable. "No authority, and no logic, permits the interrogator to proceed . . . on his own terms and as if the defendant had requested nothing, in the hope that the defendant might be induced to say something casting retrospective doubt on his initial statement that

he wished to speak through an attorney or not at all." [62]

That Munson continued to talk with the interrogator in the face of continued questioning does not diminish the validity of his request. Munson's constitutionally-protected right to silence attached as soon as he said "I'm done talkin'," and at that point the interrogator was bound to "scrupulously honor" Munson's request. Such bright-line rules exist both to protect the accused as well as to provide clear standards to guide law enforcement officers and the courts.

The Sixth Circuit reached a similar conclusion in *McGraw v. Holland.* [63] Tina McGraw was sixteen years old when she was charged as an accomplice to a rape. [64] In response to a police interrogator's questions, she stated: "I don't want to talk about it," and she indicated that her reason for not wanting to discuss the crime was because she didn't want "to walk the streets and get[ ] shot and killed for tellin'." [65] The Sixth Circuit suppressed the resulting confession in part because it found "no support, either in logic or in law, for the proposition that an otherwise unambiguous expression of a desire to remain silent can somehow become ambiguous if prompted by a fear of retaliation." [66] That the defendant's fear was so apparent should have made it "even more clear that she really did not want to talk about the rape." [67]

We agree with the Sixth Circuit that an otherwise unambiguous invocation of the right to remain silent does not become ineffective merely because it appears to be motivated by fear of retaliation.

## V. CONCLUSION

Because Paul Munson unambiguously invoked his right to remain silent, and because the police interrogator failed to scrupulously honor this request, we conclude that Munson's subsequent confession to the crime

**60.** *Michigan v. Mosley,* 423 U.S. 96, 103–04, 96 S.Ct. 321, 46 L.Ed.2d 313 (1975).

**61.** *Id.* at 105–06, 96 S.Ct. 321.

**62.** *Smith v. Illinois,* 469 U.S. 91, 98–99, 105 S.Ct. 490, 83 L.Ed.2d 488 (1984) (citation omitted) (emphasis in original).

**63.** 257 F.3d 513 (6th Cir.2001).

**64.** *Id.* at 514.

**65.** *Id.* at 515.

**66.** *Id.* at 519.

**67.** *Id.*

must be suppressed. Accordingly, we RE-VERSE the judgment of the court of appeals and REINSTATE the judgment of the superior court.

## APPENDIX

Statement of:

HOMICIDE S–PAUL MUNSON
 Q = DETECTIVE HOFFBECK
 D = DETECTIVE PARKER
 A =PAUL MUNSON

Q. This is on file # 99–46526. Today's date is September the 15th, 1999. This is DE-TECTIVE HOFFBECK and DETEC-TIVE PARKER in Portland, Oregon, the time now is uh ... approximately ... and uh.. the time, local time is approximately 7:30 p.m. and I'll be talking to Paul MUN-SON in just a moment.

UM. _____

Q. Thanks.

UM. _____

Q. OK.. Paul let me introduce myself to you.

A. OK

Q. I'm DETECTIVE HOFFBECK.. An-chorage Police Department..

A. Hi.

Q. This is DETECTIVE PARKER. An-chorage Police Department..

D. Same place..

A. Oh your mister.. Dave PARKER? Oh yeah..

Q. Paul you saw there's a tape recorder there running?

A. Uhhuh.

Q. And uh you've been arrested.. let me see a copy of that uh warrant over there please.. you were arrested over at the Vi-king Hotel here uh ... oh prob'ly about an hour or so ago now, cause the time now is.. I got about Uh 20 minutes to 8 Portland time. Gonna show you an arrest warrant for your arrest, Paul.. are you Paul MUN-SON, date of birth of 12–21 of '81?

A. Uhhuh.

Q. OK. Read English are you Paul?

A. Yeah.

Q. OK. Let that read there for ya ...

A. Murder one..

Q. Conspiracy to commit murder one.

A. Yeah.

Q. OK. So basically uh you're charged with murder in the first degree and conspiracy to commit murder in the first degree. Your bail is set at $500,000 cash only. And defendant may not be released until court approves a third party custody. This is an Alaska warrant. Obviously you know we're not in the State of Alaska.

A. Uhhuh.

Q. We're in the sate of Wash.. or Oregon. OK? We have to follow not only Alaska laws, but the Oregon laws, OK?

A. Uhhuh.

Q. But the first thing is since you're in this room.. uh that just indicates in our com-puter that you're mother reported you as a runaway also. Paul, I want to uh, I wanta talk to you about some things.

A. Uhhuh.

Q. I wanta talk to you about the homicide that took place up in Anchorage, is what I wanta talk to you about. Before I can talk to you about anything.. _____ you're well aware of what I have to do. I have to read you your Constitutional Rights.

A. Yeah.. Yeah..

Q. That there. I'm gonna read those there to you in a few minutes here.. but before.. when I get finished here even.. before you even start to say anything at all.. there's a couple of things I wanta say to you before.. before that goes on there, OK? OK.. You have the right to remain silent, do you understand that? Paul?

A. Yes.

Q. OK. Anything you say can and will be used against you in a court of law, you understand that?

A. Uhhuh.

Q. You do?

A. Yeah.

Q. OK. Now the tape recorder doesn't pick up some times when you nod so..

A. Oh OK.

Q. So if you say it, I'd appreciate it..

A. Huh..

Q. You have the right to talk to a lawyer and have him present with you while you're being questioned if you under. Do you understand that?

A. Yes.

Q. OK. if you cannot afford to hire a lawyer, one will be appointed to represent you before any questioning if you wish one, do you understand that?

A. Yeah.

Q. OK. Now keep in mind here, all these questions. If you have any questions about any of these here, please ask me about 'em, OK?

A. OK.

Q. You can decide at any time to exercise these rights and not answer any questions or make any statements.

A. Yeah I know..

Q. You understand.. you understand that?

A. I.. uh uh(?)

Q. OK. Do you understand each of these rights as I've explained them to you?

A. Yes ...

Q. OK. Now having these rights in mind now I wanta ask you ... I wanta tell you basically a couple things that we.. that we know about.

A. Uhhuh.

Q. And then at the end of that there if you wanta talk to us you can talk to us, OK? One.. let me lay out some.. Just some basic, basic things to you.. I'm not gonna tell you everything that I have right now ... and I think you prob'ly know a lot of the things I do already have. First of all I have your car in custody. That was the car that was used to transport Wolfie out to Eklutna. OK? We've already search the car and we found a ton of evidence already in that car. We've already located the shell casing that was found out there, and we've matched it up to the gun that your friend, Sam used to shoot him with, alright? We've already done all those type of things. We've already got statements from uh.. we've got statements from Bryan, course you already knew that there. And we've also got statements

from somebody else, and I'll let you hear about those in just a few minutes here, OK?

A. Nn.

Q. And on those statements there that I'm gonna let you hear, you're gonna hear you own voice on there, because we were listening to all your phone calls..

A. Ahh.

Q. OK? So we have all that information about you.. the choice is up to you.. you wanta talk to us about it?

A. I have a question about that? What happens to me if I talk to you guys?

Q. Whether you talk to us or not, the same thing is gonna happen to ya.

A. So if I don't say anything.. the same thing'll happen to me?

Q. Well, let's put it this way here Paul ... when we are finished speaking, whenever that is.. whether it's in 5 minutes or if it's in a half hour or whenever it is, you're going to go to a uh.. a juvenile facility here in.. in Oregon.

A. Uhhuh.

Q. And then tomorrow you're prob'ly ... I think the Oregon law is that you're goin' be brought before some type of a hearing at that time.. to find out how you wanta go back to Alaska. Whether you're going to volunteer to go back to Alaska or be extradited to go back to Alaska.

A. Uhhuh.

Q. And then you'll be.. once those hearings are over and if it's granted then you'll be taken back to Alaska at that particular time.

A. So what'll happen to me in Alaska?

Q. You'll be held accountable to answer to those charges of murder in the first degree and what's the other one there uh..

D. Conspiracy to commit murder..

Q. And uh conspiracy to commit murder in the first degree.. you're going to be held accountable for those.. if.. you're charged with those.

A. So I'm gonna go to jail?

Q. Of course, yes, you're going to go to jail.

A. And it doesn't matter if I talk or anything? Right?

Q. Well that.. that's up to you y'know ... it's really up to you.. let me give you kind of a uh.. of a scenario about something here.. now keep in mind when I read there, no promises or threats are being made to you here ... if you were sitting up on a bench and a judge _____ right?

A. Uhhuh.

Q. This is just a thought here, if you were sitting up there, and you had two people come in front of you.. one was being cooperative and the other one wasn't.. how would you feel about that?

A. Uh.. I'd wanta be the cooperative one..

Q. I'm not tellin' you what to do.

A. I.. I know but I ... see..

Q. And I wanta ask you some questions about what happened out there that night. Why.. actually I wanta know why in the world you of all people, went out there with 'em.. it befuddles me to know that there.. I can understand why the other ones went out there, but I'd like to hear what you got to say about it. And only you can tell me about that. No one else can read your mind, but that's your choice.. maybe it's a simple answer, maybe it's a complicated answer. Maybe you think it's something to do with your home life. Maybe it's something to do, you got caught up with that night.. y'know? I don't know.. I don't know.. Show you a list of names, I'm sure you could recognize a lot of those names.. Those are the names of the people we've already talked to.. You wanta look at that again?

A. Yeah. Is this all of 'em?

Q. No, that ain't all of 'em.. That's just the list that I'm.. showing you right there at this time.. why did you go out there that night? Somebody threaten you to go out there?

A. No. I don't know why we went out there..

Q. Maybe you don't know why "we" went out there, but why did you go out there?

A. Why did I go out there?

Q. Yeah.

A. Cause I had the car.

Q. Your car..

A. That was it..

Q. Now earlier in the night.. you willin' to have this conversation with me?

A. Uhhuh.

Q. OK. That's a yes, right?

A. Yes..

Q. OK. Earlier on in the day time when you guys were drivin' around, you and Sammy and uh.. and Shane, Bryan, Jack ... drivin' around uh.. the subject of killin' Wolfie came up many times.. even went over and met the niece. The little girl that was molested. The subject of uh mutilating Wolfie's hands and uh cutting his fingers off.. murdering him..

A. I didn't say one thing..

Q. Well, I don't know, you tell me what happened.. I wasn't in the car. I wasn't in the car Paul. DETECTIVE PARKER wasn't in that car.. it's.. how old are you now?

A. Seventeen

Q. You'll be 18.. uh.. December?

A. Yeah

Q. You got a long.. long life ahead of you.. where you spend it at's.. I don't know where you're gonna spend it at.. the.. the manner of ... what went on in the car there and the conversations that took place out at.. uh.. out at Point Woronzof and the apartments up in uh.. your apartment up in Mt. View..

A. Uhhuh.

Q. Um, I'd like to hear 'em..

A. What do you want know?

Q. Well, it's your story.. why don't you start at the beginning of it and tell me the story..

A. Well..

Q. How about.. how about when you first.. did you ever go, do you know uh, do you know these people? do you know uh..

A. Know everybody on the _____ sheet.

Q. Huh?

A. I said I know everybody on the _____ sheet..

 

Q. On this uh yellow sheet there's a Chery-lin MITCHELL, Joanna PFEIFER uh Lynette.. Brandi.

A. Uhhuh.

Q. Uh Jack RUTHERFORD, Bryan RUTHERFORD.. Souvang, Khamkeo.. Sommith, Paul of course, and Sam. You know all those names?

A. Yeah.

Q. Tell me how you uh.. how you got to know uh Sam? Let's start with that one there?

A. Uh.. me and Shane met him at a party.. and he.. he was.. he was uh.. uh.. I guess.. cousins of whatever with Eddie.. the other roommate.

Q. Yeah.

A. And then he became our roommate, and that's how we _____

Q. Where were you living at the time uh.. Paul?

A. My house..

Q. And that's over there in uh Jewel Lake?

A. Yeah.

Q. You and your mom?

A. Yeah.

Q. Anybody else living there with you?

A. Huh-uh

Q. You had your own car at that time?

A. Yeah.

Q. What kinda car did you have?

A. Honda Civic

Q. You by chance remember the license number of it?

A. No, I have no clue.

Q. OK. Is that uh.. what year is it?

A. '90.

Q. What color is it?

A. Black, four door sedan.

Q. OK. You call it black?

A. Uhhuh ... Or gray or..

Q. Yeah.. with a.. yeah.. would it surprise you the registration says gray on it?

A. Yeah.

Q. OK. Where's that car.. where do you think the car is at now? I just told you

where it's at.. but where did you think it was at?

A. Well I knew it got impounded.. because I got pulled over with it.

Q. Right, your mom had it moved to some place and then it was taken some place else..

A. Yeah I.. when she..

Q. Then the police..

A. The last time I saw it was at Polaris..

Q. OK.

A. That was the last time I saw it.. So I..

Q. And that was.. when was that?

A. Oh I don't know..

Q. That was the night after the murder wasn't it?

A. Nn-nn(Negative).. no it wasn't.

Q. It was about 1:15 in the morning the following night.. is when it was.. your car broke down there and uh two patrol officers came by and ... I think they gave you a citation for curfew and took you home?

A. Huh-uh.. they didn't give me a curfew ticket.

Q. They didn't give you one? OK.. Thank you for clearin' that up, I was under the impression you did.. gave you a ride home though did they?

A. Uhhuh.

Q. OK.. so then that's how you met Sam, right?

A. Yeah.. _____

Q. Do you remember when that was?

A. N, I had.. not good with dates. I don't know.

Q. Give me, give me approximation, do you? Approximately when it was? I'm not gonna hold you to the date on that..

A. I don't know, like a month.

Q. So maybe this is the ... 15th of um ... September.. so.. more than a month ago now?

A. Yeah.. more.. more than a month.

Q. Like first part of August or..

A. I guess.. I don't..

Q. Would that be about right though?

A. I don't know.. well it was before school started..

Q. Well that was the end of uh.. end of August so..

A. I know.. before school.

Q. Did you.. so then you eventually you moved over to the..

A. No, I was always there.. I ... I always been over there, like every.. before he was there..

Q. Before Sam moved in?

A. Oh yeah.. I was there all the time.

Q. You and uh Shane and uh..

A. Yeah.. that's how..

Q. And Eddie?

A. Me and Shane were there together.

Q. Uhhuh ... want some water?

A. No, no thanks.

Q. OK.

A. That's how we got there..

Q. OK. What um.. when did the gun start showin' up? After Sam showed up?

A. Well.. I..

Q. Or were they there.. or were they there before that.. before Sam showed up?

A. There was none there before.. I ... they.. they kept on say that there was guns in the house y'know.. and they'd(?) fire 'em, but there never was, cause me and Shane tried to check y'know where they were.. where he said they were.

Q. Uhhuh.

A. But I don't.. the first time I saw 'em was uh ... can't remember ... First time I saw'em was ... we were outside, outside the apartment.. it was Shawn(?)

Q. Is that when one of the drive-bys came by or su'um.. and the shooting started?

A. No, that was.. that was just.. it was just the first time.. that Vi came over and there and they were..

Q. Who brought 'em over?

A. Sam

Q. Sam brought 'em over? How many did he bring over that time?

A. What?

Q. Guns..

A. I saw one..

Q. What uh.. what was that?

A. Think it was the 9 mm.. or was .45, I don't know.

Q. Well, both of those type show up there so.. which one is the first one, do you remember?

A. I think it was the .45.

Q. .45?

A. Uhhuh. What's gonna happen? Is Sam gonna know what I'm saying this?

Q. Maybe Sam's already talked to me.

A. No, but..

Q. Eventually Sam is going to know, yes.. the answer to that is yes. Everybody.. everybody involved is going to know eventually.. yes they will.

A. Well, I'm done talkin' then.

Q. Before you make a final decision on that there.. play that tape there for him..

A. You know what'll happen to me.

Q. Listen to this here ... not what you think is going to..

**Tape playing within a tape:**

UM. _____ I don't know dude.. uh dude.

UM. Alright I ... I have some questions I have, because I'm just trippin' about this whole thing.. did you see Wolfie's freakin' head explode when Sam shot him?

UM. Yeah.

UM. You did?

UM. Uhhuh

UM. Because I'm just.. cause I.. I looked away and I looked up at Bryan and I'm just tryin' to figure out what's happenin' and everything..

UM. So you didn't see _____ there?

UM. No.

UM. I was watchin' _____ the whole time.

UM. You were watchin'?

UM. I was there.. yeah I watched the whole thing. I wasn't too far away..

UM. You were like pretty close to Sam huh?

UM. _____ Yeah.. when when'd you dream about dude?

**UM. Just about.**

Q. You've already said it..

A. I know but..

Q. So what's the point? You've already said it so..

A. You don't.. you don't understand ...

Q. What do I don't understand?

A. All those people.

Q. What do you think? What do you think that I don't understand..

A. You don't..

Q. No, no.. you've got something in the back of your mind that you think you've magnified.. Sam has got you runnin' scared about something.. you think is going to happen.. I'm tellin' ya.. you think is gonna happen.. let me tell you su'um what's really gonna happen. nothin's gonna happen.. Ain't a dang thing gonna happen.

A. How do you know that?

Q. I been doin' this for about 30 years.

A. Uhhuh.

Q. Right? It's never happened.. it don't happen.. only in your figment of your imagination does it happen. Because.. and you know why.. they do this.. people like Sam.. say that there.. to keep you quiet, that's the only reason.. Cause when we get finished with talkin' with Sam.. again here when we talk to Sam and some more of these..

A. So have you already talked to Sam?

Q. I've talked to Sam..

A. Can I hear his tape?

Q. No.. Sam's not gonna hear your tape tonight either. No he's not ... next time you see Sam will be somewhere in some hearing Alaska.. You have no reasons at all, because every one of these people turn around and they all try to do the best thing for themselves..

A. Let me ask you a question.

Q. You can ask any question you want..

A. You guys have Shane, right?

Q. You bet.

A. I thought so.

Q. You wanta ask some more questions and I'll tell you the truth too, I'm not gonna lie to anybody.. do I have Bryan? You bet.

A. Oh I know you guys have Bryan..

Q. Do you wanta ask some more questions?

A. Is he in Fairbanks?

Q. I'm ain't gonna tell you where he's at..

A. No, I just.. I just..

Q. But the answer to that's no.

A. So you guys are the ones that had Shane call us.. Hnn.. yeah..

Q. Prob'ly did. Does that make Shane a bad person?

A. No it don't.. I ... I..

Q. Shane goin' in farther than you are..

A. Why?

Q. Shane's charged more than you are.

A. So I'm the lightest?

Q. Yeah. You're the light. you're the light weight of this bunch.

A. What's Shane and Bryan have?

Q. Bryan's idea, wasn't it?

A. Yeah..

Q. Yeah.. it was his idea to do all this stuff.

A. ————

Q. Shane was packin' a gun that night and he drove the car.. and as far as I know about Paul, he just provided the car..

A. Yeah.

Q. Right?

A. Uhhuh. That's it.

Q. That's it.. so what'd it sound like when you got out there?

A. What did what sound like?

Q. What'd Wolfie have to say before he got shot? What was goin' ... what was the conversation in the car out there, goin' out there?

A. Nothin'.. it was just me and Shane and I wasn't really payin' attention ... in the back. I was in the passenger seat.. we were smokin' weed.

[Transcript of interrogation continues for 54 pages.]

MATTHEWS, Justice, dissenting.

For the reasons expressed by the court of appeals I believe that Munson's statement should not be suppressed. Because the court

of appeals opinion has not been published, I attach it as an appendix. I have the following additional observations.

When Munson made his statement "Well I'm done talkin' then" it was obvious that he was afraid of reprisals by his accomplices. Officer Hoffbeck cautioned Munson to listen before making a final decision to cut off the interview. Hoffbeck then played a tape of a conversation between Munson and another person that confirmed Munson's presence at the murder. After playing the tape, Hoffbeck told Munson that his fear of reprisals was unrealistic, based both on Hoffbeck's long experience as an investigator and the fact that all the actors were in custody. Munson seemed to have been persuaded, asked a few questions about the other participants in the crime, and permitted the interview to continue.

On a common-sense level, what Hoffbeck did seems reasonable. It was responsive to Munson's concerns[1] and not coercive, hostile, or repetitive. It did not suggest that Munson was not free to refuse to speak further about the crime. Because all of this seems to me to be beyond dispute, I have a hard time accepting my colleagues' conclusion that Munson's *Miranda* rights were violated.[2]

To put the matter in a legal framework, it seems to me that Munson's statement was an equivocal assertion of his *Miranda* right to silence that the police were not required to understand as terminating the interrogation. As the court's opinion acknowledges, the general rule is that a suspect must articulate his desire to cut off questioning "with sufficient clarity that a reasonable police officer in the circumstances would understand it to be an invocation of the suspect's rights"; "equivocal" or "ambiguous" assertions are not enough.[3] This standard was initially developed in *Davis v. United States* to evaluate ambiguous assertions of the right to counsel by suspects undergoing station-house interrogation.[4] According to *Davis*, "if a suspect makes a reference to an attorney that is ambiguous or equivocal in that a reasonable officer in light of the circumstances would have understood only that the suspect *might* be invoking the right to counsel, our precedents do not require the cessation of questioning."[5] The United States Supreme Court has not said whether *Davis* applies to the *Miranda* right to silence, but several federal courts have applied *Davis* in this context, and I agree with today's opinion that this is the proper approach here.[6] The standard is objective, and requires consideration of all the circumstances surrounding the declaration to determine its meaning.[7] Further,

1. Playing the surreptitiously recorded tape in which Munson and another participant discuss the crime was probably intended as a persuasive tool to convince Munson to talk, regardless of his reasons for not talking. But the fact that one has already been tricked by a co-participant into making a tape-recorded statement about a crime would be relevant to a defendant who is hesitant to speak because of fear of reprisals. As the state argues, the tape showed that as a reason to stop talking "fear of retaliation by Camanga ... was irrational as Munson had already incriminated Camanga" in the surreptitiously recorded conversation.

2. *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

3. Maj. Op. at 1048–49; *Medina v. Singletary*, 59 F.3d 1095, 1101 (11th Cir.1995) (rejecting "equivocal" or "ambiguous" invocation).

4. 512 U.S. 452, 459, 114 S.Ct. 2350, 129 L.Ed.2d 362 (1994).

5. *Id.* Many cases have adopted this statement as the crux of the *Davis* test. *See, e.g., Fitz v. State*, 275 Ga. 349, 566 S.E.2d 668, 672 (2002); *Taylor*

*v. State*, 689 N.E.2d 699, 703 (Ind.1997); *Commonwealth v. Jones*, 439 Mass. 249, 786 N.E.2d 1197, 1206 (2003).

6. *See United States v. Hurst*, 228 F.3d 751, 759–60 (6th Cir.2000); *United States v. Banks*, 78 F.3d 1190, 1197 (7th Cir.1996), *vacated on other grounds, Mills v. United States*, 519 U.S. 990, 117 S.Ct. 478, 136 L.Ed.2d 373 (1996); *Medina*, 59 F.3d at 1101.

7. *See* Maj. Op. at 1048 (test is based on how the statement would be understood by a reasonable officer "in the circumstances"); *Davis*, 512 U.S. at 459, 114 S.Ct. 2350 (same); *see also Nashoalook v. State*, 663 P.2d 975, 977 (Alaska App. 1983) (rejecting argument that defendant had invoked *Miranda* right to silence, based on "totality" of circumstances); *United States v. Johnson*, 56 F.3d 947, 955 (8th Cir.1995) (similar). In the analogous context of determining whether a suspect is in custody for *Miranda* purposes, we have adopted an objective test and explicitly "rejected a subjective test based on the thoughts of the police officer or defendant." *State v. Salit*, 613 P.2d 245, 257 (Alaska 1980); *see also Hampel v. State*, 706 P.2d 1173, 1181 n. 7 (Alaska

whether a statement is an objectively unambiguous assertion of a *Miranda* right is a question of law for the reviewing court, at least where (as here) there is no dispute as to the underlying historical facts.[8] These legal principles are consistent with Alaska precedent,[9] and appear to be common ground between me and the opinion of the court.

But we part company with respect to the court's treatment of Munson's statement "I'm done talkin' then," in particular as to the issue of whether it is proper to consider Munson's reasons for making this statement. *Miranda* was devised in order to implement in a police interrogation setting the right not to be a witness against oneself and the right to counsel. But a suspect may refuse to speak for any number of reasons having nothing to do with these rights—emotions such as fear of reprisals, anger, hostility, and distrust may underlie a refusal to speak. Refusals based on emotions such as these, if persisted in, must be honored,[10] but when initially made they are often properly regarded as only ambiguous or equivocal assertions of the right to silence.[11] A signal that the speaker would like to stop talking can appear unambiguous in form, yet the context can make it reasonable to understand the statement as something less than a clear invocation of the right to silence. "Depending upon the surrounding circumstances, even a statement which itself appears to amount to an assertion of the right to remain silent (e.g., 'I ain't saying nothing') may be held not to have that effect."[12] For example, a statement that seems like a simple request to stop the interrogation may be legitimately understood as merely expressing an objection to some aspect of the interrogation, such as an objection to the person conducting the interroga-

App.1985) (in measuring the coercive effect of an officer's response to an equivocal assertion of the right to counsel, "We emphasize that the standard we adopt is an objective one, and does not depend on the subjective intent of the interrogating officer.").

8. *See State v. Ridgely,* 732 P.2d 550, 554 (Alaska 1987) (while determinations of observable facts are reviewed for clear error, inferences of suspect's mental state based on observable facts and the ultimate voluntariness of confession are subject to de novo review); *State v. Smith,* 38 P.3d 1149, 1153 (Alaska 2002) (similar, whether suspect was in custody for *Miranda* purposes was mixed question of law and fact). I note that some cases from other jurisdictions review purported invocations of *Miranda* rights under the clearly erroneous standard. *See, e.g., United States v. Johnson,* 56 F.3d 947, 955 (8th Cir. 1995). There is however a good argument that these decisions are not only inconsistent with our precedent, but contrary to *Ornelas v. United States,* 517 U.S. 690, 116 S.Ct. 1657, 134 L.Ed.2d 911 (1996). *Ornelas* holds that once the "historical facts" are established, probable cause determinations, including whether the facts suffice to generate a reasonable suspicion in a reasonable officer, are to be determined de novo on appeal. The United States Supreme Court has further suggested that *Ornelas* should govern decisions on whether *Miranda* has been invoked. *See Mills v. United States,* 519 U.S. 990, 117 S.Ct. 478, 136 L.Ed.2d 373 (1996).

9. *See, e.g., Nashoalook,* 663 P.2d at 977–78 (viewing the "totality" of the circumstances, defendant's "refusal" to speak could be understood as an objection to tape-recording rather than an objection to interrogation in any form, was there-fore an "ambiguous or equivocal" invocation of the right to silence, and thus "did not obligate the police to cease further interrogation").

10. In a police interrogation setting, but not in court. *See Minnesota v. Murphy,* 465 U.S. 420, 429–30, 104 S.Ct. 1136, 79 L.Ed.2d 409 (1984) (*Miranda* does not apply "outside the context of the inherently coercive custodial interrogations for which it was designed"; outside such contexts a person is required to answer a question unless there is "some rational basis for believing that it will incriminate him") (internal quotation marks omitted); *United States v. Kilgroe,* 959 F.2d 802, 804–05 (9th Cir.1992) ("the courtroom ... is not the type of setting that would justify invoking *Miranda's* prophylactic rule. The *Miranda* Court itself recognized that 'the compulsion to speak in the isolated setting of the police station may well be greater than in courts or other official investigations, where there are often impartial observers to guard against intimidation or trickery.' ") (footnote and citation omitted); 1 John W. Strong et al., McCormick on Evidence § 123, at 472 (5th ed.1999) (in-court assertions of privilege appear to require at least a "theoretical risk of [criminal] liability"); *cf. Kastigar v. United States,* 406 U.S. 441, 92 S.Ct. 1653, 32 L.Ed.2d 212 (1972) (government may compel testimony from witnesses over self-incrimination objections if the witnesses are granted immunity from prosecution).

11. Numerous illustrative cases are collected in 2 Wayne R. LaFave et al., Criminal Procedure § 6.9(g), at 607 n. 141 (2d ed.1999).

12. *Id.* § 6.9(g), at 607 (footnote omitted).

tion or the use of a tape recorder.[13] Or refusals to continue speaking that are based on emotional or practical objections—such as fear of reprisals or anger at the way the interrogation has proceeded—that have nothing to do with fear of incrimination can properly be viewed as temporary or provisional. In these situations the speaker's motive is relevant, and courts have refused to find a clear invocation of the right to silence.[14]

I do not question that a suspect can assert a right to silence in a police interrogation context when the suspect is motivated by a fear of reprisals, or even where the suspect has no articulable reason at all for keeping silent. But I do think that, where the suspect's reluctance to speak is plainly based on concerns unrelated to self-incrimination, and where these concerns might be met by the police in a way that does not overpower or belittle the suspect's fundamental right to silence, the suspect's initial objection to speaking should not normally be understood as an unambiguous assertion of the right to silence sufficient to cut off further inquiry.[15]

The key is that police attempts to meet the objection (until and unless they are met with a clear indication that the suspect is hostile or indifferent to these attempts) have little potential to suggest that the right against self-incrimination is illusory.

This case is an illustration of the foregoing. Munson was given a *Miranda* warning and was willing to waive these rights. What caused him to make his "done talkin' then" statement was unrelated to these rights. In context a fuller expression of what he said would be "Well I'm done talkin' then because I am afraid that if I do talk I will be killed by Camanga." Since Munson's statement implies a continued willingness to talk if the fear motivating the refusal could be put to rest, I believe the statement should be construed as a merely equivocal invocation of the right to silence.[16] Put in *Davis* terms, given the turn the interrogation had taken when Munson said he was done talking, "a reasonable officer in light of the circumstances would have understood only that the

---

**13.** *See, e.g., Nashoalook,* 663 P.2d at 977–78 (refusal to speak was, viewed in context, based on objection to tape-recording); *Henry v. State,* 574 So.2d 66, 69 (Fla.1991) ("I'm not saying nothing to you" in context an objection to the interrogator, not an invocation of the right to silence).

**14.** *See, e.g., United States v. Sanchez,* 866 F.Supp. 1542, 1559 (D.Kan.1994) ("I can't say nothing" ambiguous because reasonably interpreted by the trooper "to essentially mean that the defendant could not say anything for fear of reprisal by his cohorts, rather than an invocation of his right to remain silent."); *State v. Williams,* 535 N.W.2d 277, 281, 284 (Minn.1995) (After being accused of lying suspect stated "I don't have to take any more ...." and walked out of the interrogation room and back to his cell; suspect's statement and behavior were motivated by anger and did not amount to "an unequivocal and unambiguous invocation of his right to remain silent.").

**15.** The suspect's dogged refusal to speak, and the interrogators' determination to overcome this refusal, distinguish *McGraw v. Holland,* 257 F.3d 513 (6th Cir.2001), from Munson's case. In *McGraw* the suspect refused to speak eight or nine times but the detective continued to insist that she answer: " 'I just don't wanna talk about it,' she said for the eighth or ninth time.... Refusing to take no for an answer, the detective kept urging full disclosure." *Id.* at 515. In addition, far from suggesting as Officer Hoffbeck did in this case that the final decision to cut off questioning was up to the suspect, the detective

in *McGraw* told the suspect that she *had* to talk about the crime. Stressing the repeated nature of the suspect's refusals to talk (so describing them several times during the opinion) the Sixth Circuit concluded: "Any reasonable police officer, knowing that exercise of the right to silence must be 'scrupulously honored,' would have understood that when Tina *repeatedly* said she did not want to talk about the rape, she should not have been told that she *had* to talk about it." *Id.* at 518 (first emphasis added). The repeated nature of the suspect's refusals was an important factor underlying the court's conclusion that the suspect had unambiguously asserted her right to silence:

> Tina's lawyer does not deny that an invocation of the right to silence, if it is to be effective, must be unambiguous as well. As far as we can see, however, there was nothing ambiguous about Tina's *repeated* insistence that she did not want to talk about the rape. When Tina *kept saying*, without qualification, that she just did not want to talk about the subject-making these declarations after she had been formally advised of her right of silence-it would simply not be reasonable to take her words at less than face value.

*Id.* at 519 (emphasis added).

**16.** Hoffbeck testified that he did not believe that Munson was invoking his *Miranda* rights. This, of course, is not binding, but, as the court of appeals noted, it is supported by an objective reading of the transcript.

suspect *might* be invoking" his right against self-incrimination, as opposed to the clear and unambiguous invocation required to shut down all questioning.[17]

Once a statement is found to be equivocal, all that should ultimately be required in response to it is noncoercive conduct that does not imply that the right to silence has been lost and may no longer be exercised.[18] That test too would be readily met in the present case.

For these reasons I would affirm the decision of the court of appeals.

## APPENDIX

### NOTICE

*Memorandum decisions of this court do not create legal precedent.* See *Alaska Appellate Rule 214(d) and Paragraph 7 of the Guidelines for Publication of Court of Appeals Decisions (Court of Appeals Order No. 3). Accordingly, this memorandum decision may not be cited for any proposition of law, nor as an example of the proper resolution of any issue.*

### IN THE COURT OF APPEALS OF THE STATE OF ALASKA

Court of Appeals No. A–7694

Trial Court No. 3AN–S99–7945–CR

STATE OF ALASKA,

Petitioner,

---

**17.** 512 U.S. at 459, 114 S.Ct. 2350.

**18.** *Davis* permits officers to ignore ambiguous invocations of the *Miranda* right to counsel, 512 U.S. at 461–62, 114 S.Ct. 2350, and this approach has been adopted by some but not all jurisdictions with respect to the right to silence. *Compare Coleman v. Singletary*, 30 F.3d 1420, 1424 (11th Cir.1994) (applying *Davis;* police have no duty to clarify ambiguous invocation of the right to silence and may continue asking questions), *with United States v. Ramirez*, 79 F.3d 298, 304 (2d Cir.1996) (appearing to impose duty to clarify). Alaska law has taken a somewhat different approach to the right to counsel, and it seems appropriate to apply a similar analysis to the right to silence. In *Mallott v. State*, 608 P.2d 737 (Alaska 1980), in the context of an equivocal request for counsel, we stated that the reason

v.

PAUL DAVIS MUNSON,

Respondent.

Court of Appeals No. A–7723

Trial Court No. 3AN–S99–7945–CR

PAUL DAVID MUNSON

Petitioner,

v.

STATE OF ALASKA,

Respondent.

*MEMORANDUM OPINION AND JUDGMENT*

[No. 4494—November 21, 2001]

Appeal from the Superior Court, Third Judicial District, Anchorage, Michael L. Wolverton, Judge.

Appearances: W.H. Hawley, Jr., Assistant Attorney General, Office of Special Prosecutions and Appeals, Anchorage, and Bruce M. Botelho, Attorney General, Juneau, for Petitioner and Respondent State of Alaska. Cynthia L. Strout, Anchorage, for Respondent and Petitioner Paul David Munson.

Before: Coats, Chief Judge, and Mannheimer and Stewart, Judges.

STEWART, Judge.

The superior court found that Paul David Munson made an equivocal statement about his right to silence during a custodial interview with the police. The court suppressed

---

why an invocation of *Miranda* rights must be appropriately responded to "is that ignoring or rebuffing a suspect's invocation of his or her constitutional rights will convince the suspect that such rights are illusory." *Id.* at 742. We stated that this had not occurred under the circumstances of that case: "Had Mallott initially desired counsel to protect his right to remain silent, we do not believe the initial trooper response and the interrogation just described would have convinced him that a second attempted exercise of his rights would have been futile. We therefore find the trooper response to Mallott's request for counsel proper...." *Id.* at 743. This aspect of *Mallott* can be used as a standard to decide whether a particular response to an equivocal assertion of the right to silence is legally acceptable.

the remainder of Munson's statement because the police did not clarify Munson's intent. We granted the State's petition for review of that order. Because case law provides that the police have no obligation to clarify an equivocal statement about the right to silence during custodial interrogation, we reverse the order of the superior court suppressing a portion of Munson's statement.

We also granted Munson's petition for review of the court's order that rejected his claim that his statement to the police was involuntary. We uphold that order because we conclude, as did the superior court, that Munson's statement was voluntary.

### Facts and proceedings

On September 14, 1999, the State charged Munson, Samuel J. Camanga, Shane M. Clapper, and a juvenile for the September 1, 1999, homicide of Morgan F. Gorsche. On September 15, 1999, Anchorage Police Detectives Joseph Hoffbeck and David Parker flew to Portland, Oregon, to arrest Munson. After Munson's arrest, Hoffbeck and Parker met with Munson at a Portland police station and tape recorded their interview.

Detective Hoffbeck advised Munson of his *Miranda* rights.[1] Munson stated that he understood those rights. During the interview, Munson admitted that he was involved in Gorsche's homicide. The grand jury indicted Munson and his cohorts for first-degree murder,[2] conspiracy to commit first-degree murder,[3] and second-degree murder[4] for the shooting death of Gorsche.

Munson moved to suppress his statement to the police, claiming he had invoked his right to silence during the interview. Munson also contended that his statement to the police was involuntary because the police threatened him in order to induce him to waive his rights and confess. Superior Court Judge Michael L. Wolverton concluded that the police should have clarified Munson's ambiguous invocation of his right to silence—

"Well, I'm done talkin' then." Because the police did not clarify that statement but continued to interview Munson, Judge Wolverton suppressed all of Munson's interview that followed that statement. Judge Wolverton rejected Munson's claim that he had been threatened and concluded that Munson's statement was voluntary.

### Discussion

*Did the police threaten Munson such that his statement was involuntary?*

Detectives Hoffbeck and Parker met with Munson in a conference room at the Portland police station after Munson's arrest. Detective Hoffbeck informed Munson that he had been charged with first-degree murder and conspiracy to commit murder and that his bail had been set at $500,000. Hoffbeck advised Munson of his *Miranda* rights and asked if he understood each of them. He then detailed the evidence that connected Munson to Gorsche's murder: evidence recovered from Munson's car (which was used to transport Gorsche to Eklutna where he was killed); a shell casing that matched Camanga's gun; a statement from B.R., a juvenile participant in the crime; and a statement from an undisclosed witness, which turned out to be a recorded phone conversation of Munson's. Detective Hoffbeck continued:

> *Hoffbeck:* OK? So we have all that information about you ... the choice is up to you ... you wanta talk to us about it?
> *Munson:* I have a question about that? What happens to me if I talk to you guys?
> *Hoffbeck:* Whether you talk to us or not, the same thing is gonna happen to ya.
> *Munson:* So if I don't say anything ... the same thing'll happen to me?
> *Hoffbeck:* Well, let's put it this way here Paul ... when we are finished speaking, whenever that is ... whether it's in 5 minutes or if it's in a half hour or whenever it is, you're going to go to a uh ... a juvenile facility here in ... in Oregon.

---

1. See *Miranda v. Arizona*, 384 U.S. 436, 444–45, 86 S.Ct. 1602, 1612, 16 L.Ed.2d 694 (1966).

2. AS 11.41.100(a)(1)(A); AS 11.16.110.

3. AS 11.31.120.

4. AS 11.41.110(a)(1), (2); AS 11.16.110.

*Munson:* Uhhuh.

*Hoffbeck:* And then tomorrow you're prob'ly ... I think the Oregon law is that you're goin' [to] be brought before some type of a hearing at that time to ... to find out how you wanta go back to Alaska. Whether you're going to volunteer to go back to Alaska or be extradited to go back to Alaska.

*Munson:* Uhhuh.

*Hoffbeck:* And then you'll be ... once those hearings are over and if it's granted then you'll be taken back to Alaska at that particular time.

*Munson:* So what'll happen to me in Alaska?

*Hoffbeck:* You'll be held accountable to answer to those charges of murder in the first degree and what's the other one there uh ...

*Detective Parker:* Conspiracy to commit murder ...

*Hoffbeck:* And uh conspiracy to commit murder in the first degree ... you're going to be held accountable for those ... if ... you're charged with those.

*Munson:* So I'm gonna go to jail?

*Hoffbeck:* Of course, yes, you're going to go to jail.

*Munson:* And it doesn't matter if I talk or anything? Right?

*Hoffbeck:* Well that ... that's up to you y'know ... it's really up to you ... let me give you kind of a uh ... of a scenario about something here ... now keep in mind when I read there, no promises or threats are being made to you here ... if you were sitting up on a bench and a judge ____ right?

*Munson:* Uhhuh.

*Hoffbeck:* This is just a thought here, if you were sitting up there, and you had two people come in front of you ... one was being cooperative and the other one wasn't ... how would you feel about that?

*Munson:* Uh ... I'd wanta be the cooperative one ...

*Hoffbeck:* I'm not tellin' you what to do.

*Munson:* I ... I know but I ... see ...

The discussion continued, and Munson described the homicide and his participation in it. Judge Wolverton found that Detective Hoffbeck had been candid in his testimony and that his demeanor and approach during the custodial interrogation of Munson had not been threatening or coercive. He concluded that Munson's confession was voluntary:

> I simply have to find under the circumstances of this case that the scenario presented by Officer Hoffbeck was nonthreatening and didn't overbear Mr. Munson's will. I just don't think it did. And I understand that the Supreme Court may disagree with me as a legal matter, but as it was posed, this is the problem that I have with it....[I]t's one thing to say ... if you don't cooperate ... you're going to get harsh treatment, so you don't have to talk if you don't want to, but boy, you're going to get treated harsher, as opposed to this instance. And I really think this is the truth of the matter, that Mr. Munson asked an honest question, and ... [got] an honest answer.

Munson contends that the scenario described by Detective Hoffbeck was a threat. Munson argues that because the scenario was a threat, the superior court should have applied the presumption from *Beavers v. State*[5] that any statement induced by a threat is involuntary.[6]

In *Beavers,* two state troopers questioned Beavers in a police vehicle outside the restaurant where Beavers worked.[7] Beavers was sixteen years old at the time.[8] The troopers told Beavers that he was not under arrest, had not been charged with a crime, and was free to end the interview at any time.[9] While questioning Beavers about his involvement in several robberies, one of the troopers emphasized the importance of Bea-

---

5. 998 P.2d 1040 (Alaska 2000).

6. *See id.* at 1045–46, 1048.

7. *See id.* at 1041.

8. *See id.* at 1042.

9. *See id.*

vers cooperating and telling the truth.[10] The trooper said:

I know that when you're young, you do some stupid stuff, make a, make a wrong turn somewhere, okay. And, and you do some crazy stuff, okay? *But, if you're, if you try and hide it from me you're really going to get hammered.* I mean it's, you gotta come out and tell me the truth on this stuff, okay? [11]

The Alaska Supreme Court held that threat-induced confessions are presumptively involuntary absent affirmative evidence that the suspect's will was not overcome by the threats.[12] The court concluded that Beavers's confession was involuntary under this standard because the trooper's statement that Beavers would get "hammered" if he attempted to hide his involvement in the robberies conveyed the "unmistakable message that Beavers would be punished for exercising his constitutional right to silence." [13] The court found no affirmative indications that these threats had not overcome Beavers's will.[14]

In reaching this conclusion, the supreme court relied heavily on the Ninth Circuit's decision in *United States v. Harrison.*[15] Harrison, who was suspected of money laundering, opened the door of her home to find some fifteen federal agents with guns drawn.[16] The agents searched Harrison's house and arrested her and her companion.[17] Harrison was advised of her *Miranda* rights.[18] Then, after a brief silence, an agent informed Harrison of the evidence linking her to the crime and told her she could face a 20-year sentence.[19] The agent then asked her whether she thought it would be better if the judge were told that she had cooperated or had not cooperated.[20] Harrison said it would be better if she talked to the agents and they told the judge she had cooperated. Harrison then confessed her role in the crime.[21]

The Ninth Circuit concluded the police acted improperly by suggesting to Harrison that they might inform the court she had not cooperated.[22] The court concluded that "[a]lthough the agents thinly veiled their implied message behind a rhetorical question, Harrison could only conclude that she might suffer for her silence." [23] In reaching this conclusion, the Ninth Circuit observed that police generally may suggest to a defendant that cooperation could result in a more lenient sentence.[24] And the court acknowledged that suggestions to a defendant that cooperation will result in a more lenient sentence and threats to inform the prosecutor of the defendant's refusal to cooperate are "simply different sides of the same coin: 'waive your rights and receive more favorable treatment' versus 'exercise your rights and receive less favorable treatment.' " [25] But the court noted two circumstances distinguishing threats from promises of leniency.[26] First, a defendant may benefit from learning about the possibility of a reduced sentence.[27] Second, speculation that cooperation will benefit the defendant, or even promises to recommend leniency, generally are not sufficiently com-

10. *See id.*

11. *Id.*

12. *See id.* at 1048.

13. *Id.*

14. *See id.*

15. *See id.* at 1046–47 (discussing *United States v. Harrison,* 34 F.3d 886 (9th Cir.1994)).

16. *See Harrison,* 34 F.3d at 890.

17. *See id.*

18. *See id.*

19. *See id.*

20. *See id.*

21. *See id.*

22. *See id.* at 891.

23. *Id.*

24. *See id.*

25. *Id.*

26. *See id.*

27. *See id.*

pelling to overbear a defendant's will.[28] By contrast, "there is no legitimate purpose for the statement that failure to cooperate will be reported."[29] The supreme court recognized this difference in *Beavers:* "[We] agree with the Ninth Circuit's distinction between promises of leniency and threats of harsher treatment."[30]

Munson argues the threat in *Harrison* is nearly identical to Detective Hoffbeck's scenario. He claims the only purpose of Hoffbeck's rhetorical question was to suggest to Munson that he would be punished for asserting his right to silence. Thus, Munson argues the scenario was inherently coercive under *Harrison* and *Beavers.*

We agree with Judge Wolverton that Detective Hoffbeck's scenario did not threaten Munson with harsher treatment if he asserted his right to silence. As the State points out, Hoffbeck did not threaten to inform the judge of Munson's non-cooperation, as did the federal agents in *Harrison.*[31] Nor did Hoffbeck threaten that Munson would be treated more harshly than normal if he did not cooperate, as was the case in *Beavers.*[32] Rather, Detective Hoffbeck presented a scenario that *suggested* cooperation might work to Munson's benefit. The fact that a benefit might flow from cooperation is not the equivalent of a threat of harsher treatment in the event of non-cooperation. Hoffbeck told Munson that he was not making a threat or promise or telling him what to do. And at the conclusion of the interview, Munson acknowledged that he had not been threatened. Accordingly, Munson's confession was not presumptively involuntary under *Beavers.*

Judge Wolverton also concluded that Munson's statement was voluntary under the traditional totality of the circumstances test. A confession is involuntary if "an examination of all the circumstances discloses that the conduct of law enforcement was such as to overbear (the defendant's) will to resist and bring about confessions not freely self determined."[33] In evaluating the totality of the circumstances to determine whether a confession was voluntary, we consider "the age, mentality, and prior criminal experience of the accused; the length, intensity and frequency of interrogation; the existence of physical deprivation or mistreatment; and the existence of threat or inducement."[34] The State has the burden to show by a preponderance of the evidence that a confession was voluntary.[35] When the accused is a juvenile this is a heavy burden of proof.[36]

We independently examine the record to determine the defendant's mental state and its legal significance and base our conclusion on the voluntariness of the confession on the totality of the circumstances surrounding the defendant's statement.[37] Munson argues that the following circumstances show his confession was involuntary: he was seventeen years old, under arrest, told he was charged with first-degree murder with bail set at $500,000, and interrogated outside Alaska without a parent present. On the other hand, Munson's interview lasted less than two hours. Munson had something to drink and was offered crackers. There was no evidence that Munson was physically exhausted. Detective Hoffbeck testified that Munson did not appear to be under the influence of alcohol or drugs. Judge Wolverton found that Hoffbeck's demeanor was nonthreatening. And this was not Munson's

**28.** *See id.*

**29.** *Id.* (quoting *United States v. Tingle,* 658 F.2d 1332, 1336 n. 5 (9th Cir.1981)).

**30.** *Beavers,* 998 P.2d at 1047.

**31.** 34 F.3d at 890.

**32.** 998 P.2d at 1042.

**33.** *Stobaugh v. State,* 614 P.2d 767, 772 (Alaska 1980) (quoting *United States v. Ferrara,* 377 F.2d 16, 17 (2d Cir.1967) (citations omitted)).

**34.** *Sprague v. State,* 590 P.2d 410, 414 (Alaska 1979) (quoting *Brown v. United States,* 356 F.2d 230, 232 (10th Cir.1966)).

**35.** *See Beavers,* 998 P.2d at 1044.

**36.** *See id.*

**37.** *See id.*

first contact with police officers for a serious crime; Munson previously had been interviewed by police and confessed to a burglary of a record store in Anchorage. From our independent review of the record, we conclude that Munson's statement was voluntary.

We next address a remaining point raised by the State. The State claims that *Beavers,* which the supreme court decided after Munson's interview with the police, should not apply retroactively because it announced a new rule of law that a threat-induced confession is presumptively involuntary. However, this argument is moot because the scenario described by Detective Hoffbeck was not a threat.

*Did Munson invoke his right to silence?*

Munson next claims he invoked his right to silence during his interview with Detective Hoffbeck and therefore, any post-invocation statements should be suppressed. In the interview, Munson discussed the events leading up to the homicide but became hesitant when the topic moved to Camanga's involvement with the guns.

*Hoffbeck:* Who brought [the guns] over?

*Munson:* Sam [Camanga].

*Hoffbeck:* Sam brought 'em over? How many did he bring over that time?

*Munson:* What?

*Hoffbeck:* Guns ...

*Munson:* I saw one ...

*Hoffbeck:* What uh ... what was that?

*Munson:* Think it was the 9 mm ... or .45, I don't know.

*Hoffbeck:* Well, both of these type show up there so ... which one is the first one, do you remember?

*Munson:* I think it was the .45.

*Hoffbeck:* .45?

*Munson:* Uhhuh. What's gonna happen? Is Sam gonna know I'm saying this?

*Hoffbeck:* Maybe Sam's already talked to me.

*Munson:* No, but ...

*Hoffbeck:* Eventually Sam is going to know, yes ... the answer to that is yes. Everybody ... everybody involved is going to know eventually ... yes they will.

*Munson:* Well, I'm done talkin' then.

*Hoffbeck:* Before you make a final decision on that there ... play that tape there for him ...

*Munson:* You know what'll happen to me?

*Hoffbeck:* Listen to this here ...

The officers then played a tape recording of a conversation seized under a *Glass* warrant[38] in which Munson admitted watching Camanga shoot Gorsche in the head. Hoffbeck pointed out that the tape recording showed Munson already had admitted that he witnessed the murder and that Camanga was the shooter. He also reassured Munson that Camanga would not retaliate. The interview continued, and Munson continued to describe his involvement in the homicide.

In the superior court, Munson raised a two-pronged claim that he had invoked his right to silence. First, he argued that he clearly invoked his right to silence and that anything he said after that statement had to be suppressed. In the alternative, he argued that if his invocation of his right to silence was ambiguous or equivocal, then the officers were obliged to clarify the ambiguity before proceeding with the interview. The State argued that Munson had not clearly invoked his right to silence but that his comment about silence was equivocal because it expressed Munson's concern that Camanga would learn that he had talked to police. The State also argued that when a defendant makes an equivocal reference to the right to silence, a police officer has no obligation to clarify the reference. However, the State claimed that Detective Hoffbeck clarified Munson's statement.

At the evidentiary hearing, Detective Hoffbeck testified he did not believe Munson was exercising a *Miranda* right to silence when he said, "Well, I'm done talkin' then." In-

---

38. *See State v. Glass,* 583 P.2d 872, 881 (Alaska 1978), *on rehearing,* 596 P.2d 10 (Alaska 1979) (holding that under the Alaska Constitution the police must obtain judicial authorization before surreptitiously recording a private conversation).

stead, Hoffbeck thought Munson was expressing a concern that Camanga would learn what he was telling the police and retaliate against him.

Judge Wolverton found Detective Hoffbeck's testimony on the issue was honest and candid. But Judge Wolverton held that Hoffbeck was required to clarify what Munson meant by his statement "Well, I'm done talkin' then" by either reaffirming Munson's waiver or by readvising him of the *Miranda* warnings before continuing. Implicit in Judge Wolverton's analysis is his rejection of Munson's claim that he had made an unequivocal assertion of his right to silence. If Munson had made such an unequivocal assertion, then no clarification would have been needed; the interview should simply have ended.[39]

Judge Wolverton concluded that Detective Hoffbeck mistakenly believed there was a distinction between a defendant's invocation of the right to silence and a request for counsel. Judge Wolverton agreed with Munson's position that the law recognizes no distinction between a defendant's assertion of either right.

Alaska law does require the police to clarify an equivocal or ambiguous request for counsel. In *Hampel v. State*,[40] we noted that the case law divided into two generally recognized approaches when a defendant made an ambiguous or equivocal request for counsel:

> Some courts, interpreting literally the language in *Miranda* that the right to counsel may be invoked "in any manner," have held that all questioning must cease upon any reference to counsel, however ambiguous or equivocal. The second approach is to permit a limited inquiry for the purpose of clarification after an accused makes a statement that arguably might be construed as a request for counsel.

In *Giacomazzi v. State*, 633 P.2d 218, 222 (Alaska 1981), the Alaska Supreme Court implicitly rejected the first approach, while approving of the second. In noting the difficulty for a police officer in determining whether a suspect indeed intends to invoke his right to have an attorney present, the court stated: "For this reason, the officer may seek clarification of the suspect's desires." Permitting clarification of an accused's request is necessary to protect his rights without unduly interfering with reasonable police questioning. This approach avoids the rigid rule of prohibiting further questioning upon any vague reference to an attorney, while providing police and the courts with a standard which protects the rights of those who desire the presence of counsel at questioning but whose requests fail to meet an arbitrary threshold of clarity.

> We therefore follow the second, more pragmatic, approach. In keeping with *Giacomazzi*, we hold that when the accused makes an ambiguous or equivocal reference to counsel during a custodial interrogation, the officer need not immediately terminate the interrogation. Further questioning, however, must be limited to clarifying the reference. Thus, any questioning on the subject matter of the investigation must be suspended until the intent of the accused is clarified.[41]

The United States Supreme Court has since adopted a new standard when an accused makes an ambiguous or equivocal reference to counsel. In *Davis v. United States*,[42] a closely divided Court reasoned that "if a suspect makes a reference to an attorney that is ambiguous or equivocal in that a reasonable officer in light of the circumstances would have understood only that the suspect *might* be invoking the right to counsel, our precedents do not require the cessation of questioning." [43] The majority stated: "If the suspect's statement is not an unambiguous or unequivocal request for

---

**39.** *See Michigan v. Mosley,* 423 U.S. 96, 103–04, 96 S.Ct. 321, 326, 46 L.Ed.2d 313 (1975).

**40.** 706 P.2d 1173 (Alaska App.1985).

**41.** *Id.* at 1179–80 (citations omitted).

**42.** 512 U.S. 452, 114 S.Ct. 2350, 129 L.Ed.2d 362 (1994).

**43.** *Id.,* 512 U.S. at 459, 114 S.Ct. at 2355.

counsel, the officers have no obligation to stop questioning him." [44]

Since this decision, courts have extended *Davis* to cases where a suspect has made an ambiguous or equivocal reference to the right to silence.[45] Furthermore, in *Hampel v. State*, we noted that the right to counsel is more rigidly observed than the right to silence and that situations where a defendant made an ambiguous or equivocal reference to his right to silence were distinguishable from situations where a defendant made an equivocal reference to the right to counsel.[46] Several Alaska cases supported that distinction. For example, in *Vail v. State*,[47] the supreme court upheld continued police questioning of one co-defendant who had waived his *Miranda* rights but said that he did not want to talk about his co-defendant.[48] The supreme court concluded that this remark was an ambiguous remark that was not intended to cut off questioning entirely.[49] In *Pierce v. State*,[50] we rejected a claim that the State

had not shown that Pierce had waived his rights.[51] Pierce told the police that he was not sure that he wished to waive his rights but continued to answer questions.[52] In *Nashoalook v. State*,[53] we concluded that a fair and common sense reading of the totality of Nashoalook's interview with the police did not reflect an intent on Nashoalook's part to "cut off questioning entirely." [54] Instead, we concluded that Nashoalook was concerned that the interview was being tape recorded and that others in his community would find out what he told the police.[55] Because the circumstances around Nashoalook's refusal to answer questions were ambiguous, we concluded that further questioning was not prohibited.[56]

Detective Hoffbeck testified that he concluded from Munson's statement, "Well, I'm done talkin' then," that Munson was afraid Camanga would retaliate against him if he talked to the police. Detective Hoffbeck stated he did not believe that Munson was

---

44. *Id.*, 512 U.S. at 461–62, 114 S.Ct. at 2356.

45. *See United States v. Hurst*, 228 F.3d 751, 759–60 (6th Cir.2000); *United States v. Banks*, 78 F.3d 1190, 1197–98 (7th Cir.1996), *vacated sub nom.*, *Mills v. United States*, 519 U.S. 990, 117 S.Ct. 478, 136 L.Ed.2d 373 (1996), *on remand*, 122 F.3d 346 (7th Cir.1997); *Coleman v. Singletary*, 30 F.3d 1420, 1424 (11th Cir.1994); *Evans v. Demosthenes*, 902 F.Supp. 1253, 1258–59 (D.Nev.1995) (predicting that Ninth Circuit would apply *Davis* to the right-to-silence context), *aff'd* 98 F.3d 1174, 1176 (9th Cir.1996) (leaving open the question of whether the *Davis* rule extends to right to silence); *Bowen v. State*, 322 Ark. 483, 911 S.W.2d 555, 565 (1995); *People v. Arroya*, 988 P.2d 1124, 1130–31 (Colo. 1999); *State v. Owen*, 696 So.2d 715, 718 (Fla. 1997); *State v. Whipple*, 134 Idaho 498, 5 P.3d 478, 482–84 (App.2000); *State v. Donesay*, 265 Kan. 60, 959 P.2d 862, 871–72 (1998) (based in part on state law); *State v. King*, 708 A.2d 1014, 1017 (Me.1998); *State v. Williams*, 535 N.W.2d 277, 284–85 & n. 3 (Minn.1995) (based in part on prior state law); *In re Frederick C.*, 8 Neb.App. 343, 594 N.W.2d 294, 301–02 (1999); *People v. Cohen*, 226 A.D.2d 903, 904, 640 N.Y.S.2d 921 (1996), *rev'd on other grounds*, 90 N.Y.2d 632, 665 N.Y.S.2d 30, 687 N.E.2d 1313 (1997); *State v. Greybull*, 579 N.W.2d 161, 163 (N.D.1998); *State v. Murphy*, 91 Ohio St.3d 516, 747 N.E.2d 765, 779 (2001); *State v. Aleksey*, 343 S.C. 20, 538 S.E.2d 248, 253 (2000); *Dowthitt v. State*, 931 S.W.2d 244, 257 (Tex.Crim.App.1996); *State v. Bacon*, 163 Vt. 279, 658 A.2d 54, 65 (1995); *Midkiff v. Commonwealth*, 250 Va. 262, 462

S.E.2d 112, 116 (1995) (applying state law); *State v. Ross*, 203 Wis.2d 66, 552 N.W.2d 428, 431–33 (App.1996). *See also* 2 W.R. LaFave, *et al.*, *Criminal Procedure* § 6.9(g), at 605–17 (1999).

46. *Hampel*, 706 P.2d 1173, 1179 n. 4.

47. 599 P.2d 1371 (Alaska 1979).

48. *See id.* at 1378–79.

49. *See id.*

50. 627 P.2d 211 (Alaska App.1981).

51. *See id.* at 217.

52. *See id.*

53. 663 P.2d 975 (Alaska App.1983).

54. *Id.* at 977–78 (quoting *Vail*, 599 P.2d at 1378).

55. *See id.* at 978.

56. *See id.* (relying on *Michigan v. Mosley*, 423 U.S. 96, 96 S.Ct. 321, 46 L.Ed.2d 313 (1975) (holding that the admissibility of statements obtained after the person in custody has decided to remain silent depends under *Miranda* on whether the person's right to cut off questioning was scrupulously honored)).

exercising his right to remain silent. There-
fore, he continued to talk with Munson to
allay his concerns about retaliation.

Judge Wolverton accepted Detective Hoff-
beck's testimony, finding it to be "candid and
honest." Furthermore, an objective reading
of the transcript of Detective Hoffbeck's in-
terview with Munson supports the conclusion
that Munson was expressing fear of retalia-
tion rather than exercising his right to re-
main silent. Under these circumstances, we
conclude that Detective Hoffbeck did not vio-
late Munson's constitutional right to remain
silent when he continued to interview Mun-
son after Munson made the statement "Well,
I'm done talkin' then."

### Conclusion

We AFFIRM the superior court's order
that concluded Munson's confession was vol-
untary. We REVERSE the superior court's
order suppressing the portion of Munson's
interview after Munson said, "Well, I'm done
talkin' then."